IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-139

No. 458A20

Filed 5 November 2021

IN THE MATTER OF: L.G.G., L.G., and L.J.G.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 13 August 2020 by Judge Larry Leake in District Court, Watauga County. This matter was calendared for argument in the Supreme Court on 30 September 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Chelsea Bell Garrett for petitioner-appellee Watauga County Department of Social Services.*

*Michelle FormyDuval Lynch for appellee Guardian ad Litem.*

*Robert W. Ewing for respondent-appellant mother.*

*Sean P. Vitrano for respondent-appellant father.*

HUDSON, Justice.

¶ 1      Respondents appeal from the trial court's order terminating their parental rights in the minor children L.G.G., L.G., and L.J.G. (Gary, Richard, and John).[1] Because we hold the trial court did not err in concluding grounds existed to terminate respondents' parental rights based on neglect and did not abuse its discretion in

[1] Pseudonyms are used to protect the juveniles' privacy and for ease of reading.

determining that termination of respondent-father's parental rights was in Gary's best interests, we affirm.

## I. Facts and Procedural History

On 23 January 2018, Watauga County Department of Social Services (DSS) filed juvenile petitions alleging that seven-year-old Gary, three-year-old Richard, and two-year-old John were neglected juveniles. The petitions alleged that on or about 22 September 2017, DSS received a report alleging issues of inappropriate discipline and lack of supervision of the children. During the first week of DSS's assessment, respondent-mother called DSS and reported that she and respondent-father had gotten into a fight the night before and that she had left the home. She further reported that the children were in the home during the domestic violence incident but were sleeping. The social worker observed respondents' home to be "in an extreme state of despair and filth."

The family entered into a safety plan on or about 6 October 2017. Respondents agreed to refrain from domestic violence and to clean up their house and the surrounding area. On or about 11 October 2017, DSS transferred the case to In-Home Services finding the family to be in need of continuing services. During the initial visit by the In-Home Services Social Worker on 17 October 2017, "the home was again in a deplorable state." DSS discussed the need for additional services with respondents and they entered into a case plan agreeing to conduct an intake with

Daymark Recovery Services for Intensive In-Home Services and to follow all recommendations for treatment.

Respondents missed several of their scheduled intake sessions and ongoing appointments with Daymark. Respondents did not complete their intake appointment until two months after entering into the case plan. Daymark recommended that the family participate in Intensive In-Home Services and that Gary be transferred to a day treatment program "to address his extreme behavioral problems[.]" Respondents did not enroll Gary within the thirty days required under the assessment, and an additional intake session was required in order for any services to be provided. After Daymark was able to initiate their Intensive In-Home Services program, respondents attended their first meeting but failed to schedule another visit.

Gary's elementary school reported that he frequently complained of tooth pain and that it hurt for him to eat. A dental screening on 16 November 2017 at Gary's elementary school revealed that he had several cavities and "required extensive dental work." Respondent-mother did not schedule a dentist appointment or verify that Gary was still on Medicaid for several weeks, and DSS ultimately scheduled the appointment for 20 December 2017. The day before the appointment, respondent-mother contacted DSS to reschedule the appointment stating that Gary had a Christmas presentation at school the next day and insisted he be allowed to

participate. DSS rescheduled the appointment for 2 January 2018. The dental appointment confirmed Gary had multiple cavities and required "extensive treatment." The dentist stated that Gary may need to be hospitalized in order to conduct all of the necessary work. A follow-up appointment was scheduled for 22 January 2018 to begin the dental work. DSS attempted to contact respondent-mother the morning of the appointment to confirm her need for transportation. However, DSS did not receive a response from the family the entire day, and Gary did not attend the appointment.

¶ 6        On 8 February 2018, respondents appeared in court for an adjudicatory hearing on the juvenile petitions. Following an agreement between respondents and DSS, the matter was continued until 1 March 2018 to allow respondents time to demonstrate compliance and engagement in their case plan activities.

¶ 7        After the hearing, respondents allowed their Medicaid insurance to lapse again by failing to provide the Medicaid office with the necessary paperwork, and Gary's 12 February 2018 follow-up dental appointment had to be rescheduled. Respondent-mother rescheduled the appointment for one month later on 5 March 2018. Meanwhile Gary continued to complain of constant teeth pain to his teachers. On 13 February 2018, respondents did not pick up Gary from the school bus, and school personnel were unable to get in contact with them.

¶ 8        On 14 February 2018, DSS took the children into nonsecure custody and filed

additional petitions alleging the children to be neglected and dependent juveniles. Following a 17 April 2018 hearing on the juvenile petitions, the trial court entered a consent order on 31 May 2018 adjudicating the children as neglected juveniles. The court ordered respondents to enter into and comply with the components of a case plan requiring them to complete a substance abuse assessment and follow all treatment recommendations; complete a parenting assessment and follow all recommendations; complete parenting classes; secure reliable transportation; maintain safe, stable, appropriate housing; participate in recommended services for the children; meet with DSS to discuss the needs of the children and family; tend to the children's medical and dental needs; and attend visitations. Respondents were granted a minimum of one hour of supervised visitation per week.

¶ 9        The trial court held a review hearing on 14 June 2018. In an order entered 6 August 2018, the court found that respondents were not being cooperative with DSS or the court; "continued to use methamphetamine and have demonstrated no willingness to deal with that problem[;]" and admitted they would fail drug screens for methamphetamine. The trial court set the primary plan as reunification with a concurrent plan of adoption. Respondents' visitation was suspended until they showed to the satisfaction of DSS that they were making progress with their substance abuse treatment by providing a clean drug screen.

¶ 10        Following a permanency planning hearing held 6 December 2018, the trial

court entered an order on 17 January 2019 maintaining the permanent plan of reunification with a secondary plan of adoption finding that the parents had "recently made considerable progress" "after doing essentially nothing for a long period of time[.]"

¶ 11 In its next review order entered 16 April 2019, the trial court found that respondents "seem to be making great effort to comply" with their case plans at times, and "[a]t other times, they appear to be ignoring the requests of DSS and the mandates of [the c]ourt." The court found respondents had missed several drug screens and that respondent-mother tested positive for methamphetamines on or about 7 November 2018 but denied using drugs. Although respondents were attending visitations and behaving appropriately, the court found the children's behaviors had regressed since the visitations had resumed.

¶ 12 On or about July 2019, Gary and Richard reported to their therapist, Robin Spicer, that they had viewed pornography while in respondents' home. Richard also disclosed instances where he observed Gary and John engaging in sexualized behavior with each other. John acknowledged the behavior to Ms. Spicer. Richard later disclosed that he also engaged in the sexual behavior with his brothers. Ms. Spicer testified at the termination hearing that the children's assessment score was "the highest level of these kind of sexualized behaviors" and that the children "had really high symptoms that were off the charts[.]" The children all exhibited sexualized

behaviors when they entered foster care. On 31 July 2019, DSS and Ms. Spicer discussed with respondents the recent disclosures by the children. Respondents did not believe the sexual behavior had happened in their home.

¶ 13   In a permanency planning order entered 4 October 2019, the trial court changed the permanent plan to adoption with a secondary plan of guardianship and relieved DSS of further reunification efforts. The trial court found the children's behaviors had further regressed and they "appear to be out of control." Gary became more aggressive towards himself and defiant of his foster parents, Richard began wetting the bed, and John started showing aggression toward animals in his foster home. The court found that respondents both missed an appointment with the children's therapist; that respondents "have charged out of therapy sessions with the therapists, expressing frustration and doubts about the validity of these therapy sessions"; and that although respondents had made progress in improving the condition of their home, their two bedroom home "would not be adequate to meet the needs of the three Juveniles." The court found that respondents had "failed to do those things which were asked of them in March" and "still deny any responsibility for their actions, blaming the Department and the Court for their difficulties."

¶ 14   On 12 March 2020, DSS filed motions to terminate respondents' parental rights to the children. DSS alleged that grounds existed to terminate respondents' parental rights based on neglect, willfully leaving the children in foster care for more

than twelve months without making reasonable progress to correct the conditions that led to the children's removal from the home, and dependency. *See* N.C.G.S. § 7B-1111(a)(1)–(2), (6) (2019). Respondents filed their answers to the motions on 23–24 April 2020.

Following a hearing held 16 and 18 June 2020, the trial court entered an order terminating respondents' parental rights to the children on 13 August 2020. The court concluded that grounds existed to terminate respondents' parental rights based on neglect and willful failure to make reasonable progress and that termination of respondents' parental rights was in the children's best interests. Respondents appealed.

## II. Analysis

Respondents challenge the trial court's adjudication that grounds existed to terminate their parental rights to their children. Respondent-father separately challenges the trial court's dispositional determination that terminating his parental rights was in Gary's best interests.

The Juvenile Code provides for a two-stage process for the termination of parental rights: adjudication and disposition. N.C.G.S. §§ 7B-1109, -1110 (2019). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" that one or more grounds for termination exists under N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(e), (f) (2019). "If a trial court finds one or

more grounds to terminate parental rights under N.C.G.S. 7B-1111(a), it then proceeds to the dispositional stage[,]" *In re A.U.D.*, 373 N.C. 3, 6 (2019), at which it "determine[s] whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019).

## A. Adjudication

¶ 18 Respondents contend the trial court erred by adjudicating grounds for termination of their parental rights under N.C.G.S. § 7B-1111(a)(1) and (2).

¶ 19 "We review a trial court's adjudication under N.C.G.S. § 7B-1111 'to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.' " *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal. Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re T.N.H.*, 372 N.C. 403, 407 (2019) (citations omitted). "The trial court's conclusions of law are reviewed de novo." *In re M.C.*, 374 N.C. 882, 886 (2020).

¶ 20 Pursuant to N.C.G.S. § 7B-1111(a)(1), a trial court may terminate parental rights if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101(15) (2019). N.C.G.S. § 7B-1111(a)(1). Section 7B-101(15) defines a neglected juvenile, in pertinent part, as a juvenile "whose parent, guardian,

custodian, or caretaker does not provide proper care, supervision, or discipline; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare[.]" N.C.G.S. § 7B-101(15).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. 838, 841 (2020) (cleaned up). "The determinative factors must be the best interests of the child and the fitness of the parent to care for the child at the time of the termination proceeding." *In re Z.V.A.*, 373 N.C. 207, 212 (2019) (citing *In re Ballard*, 311 N.C. at 715).

¶ 21 On appeal, respondents challenge several of the trial court's findings of fact and argue that the remaining findings do not support a conclusion that grounds for termination exist based on neglect under N.C.G.S. § 7B-1111(a)(1). We address only those challenged findings that are necessary to support the court's adjudication of neglect. *See In re T.N.H.*, 372 N.C. at 407.

¶ 22 Respondent-mother first objects to finding of fact 8(sss) in which the court found that "[r]espondents told [child and family therapist Robin Spicer] that they did

not feel that the parenting classes they took prior to August 29, 2019 taught them anything new and believed the classes were not helpful to them." Respondent-mother notes she took multiple parenting classes and "testified that she did not learn anything new because the material in [the] second class was [the] same material." However, Ms. Spicer testified respondents reported to her that they had completed their parenting and mental health groups and "they repeatedly stated that they did not learn anything new about parenting and that the groups were not helpful." This testimony supports the trial court's finding of fact 8(sss). *See In re G.G.M.*, 377 N.C. 29, 2021-NCSC-25, ¶18 ("It is the trial court's responsibility to pass upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom." (cleaned up)).

¶ 23        Respondent-father challenges the evidentiary support for finding of fact 8(uuu), which states:

> Even after taking additional parenting classes since the August 2019 hearing, during the life of this case, Respondents have failed to take responsibility for their actions, failed to meaningfully engage in therapy to address the reasons their children came into DSS custody and, failed to acknowledge or address the disturbing disclosures made by the Juveniles in therapy – other than to deny them and become combative when they were brought up.

Respondent-father points to his and respondent-mother's testimonies regarding the classes they completed, the therapy they participated in, and their interest in the children's medical diagnoses and communication with the children's therapists.

¶ 24        At the termination hearing, Social Worker Melanie Ellis acknowledged respondents' participation in the components of their case plans but noted they waited for more than a year after the children entered DSS custody to begin to engage in the case plans. Ms. Ellis also testified respondents never fully acknowledged responsibility and had a significant pattern of denial throughout the case, never admitted to any instances of domestic violence or inappropriate sexual behavior in the home, and have "continued some of the repeated concerns and issues that . . . led to the removal of the children[.]" Ms. Spicer testified that when respondents were informed of the sexual behavior disclosures, respondent-father "was very angry and reactive and agitated and stated that [Ms. Spicer] told [Richard] to make those statements." She further testified that respondent-father neither believed the disclosures nor that the children "had done those things under their supervision in the home[.]" This testimony supports the trial court's findings in finding of fact 8(uuu).

¶ 25        Respondent-father next challenges findings of fact 8(iiii)–(kkkk) pertaining to respondents' progress with their housing. The trial court found that respondents were not able to secure suitable housing and that the suitability of their housing had been

a reoccurring issue in the case. The court further found that respondents' two-bedroom home was not adequate to meet the needs of the three boys with a history of boy-to-boy sexual misbehavior and that the therapists "are also of the opinion that it would not be appropriate for [Gary] to share a bedroom and believe that all the boys will need additional and hypervigilant supervision."

¶ 26 Respondent-father argues that respondents took steps to improve the safety and cleanliness of their home and that the home was now suitable to live in. He notes that both he and respondent-mother testified that they would be willing to sleep in another area of the home so the boys would not have to share the same room. Respondent-father asserts that Ms. Spicer testified she had no concerns regarding Richard and John sharing a room, and in regard to Gary, that "families are able to work these situations out but there has to be . . . hypervigilance, especially at night with sleeping so that children who have engaged in improper sexualized behavior are not . . . co-sleeping." Finally, respondent-father asserts that the two other therapists who testified at the hearing "offered no opinions regarding the appropriateness of the home."

¶ 27 Respondents were aware the trial court did not find their two-bedroom home suitable for the three children after the court found in the 4 October 2019 permanency planning order that the two-bedroom home "would not be adequate to meet the needs of the three Juveniles." Yet respondent-father testified at the termination hearing

that he believed the two bedrooms in the home would be sufficient. Respondent-father also testified that he planned to add a third bedroom but did not provide any further explanation regarding his plans or expected time frame for the addition. Additionally, although respondents both testified that they would sleep in a different area of the home so the three children would not have to share a bedroom, respondents did not offer any plan in providing the additional supervision and hypervigilance recommended by Ms. Spicer.

¶ 28        Ms. Spicer testified that respondents "did not feel comfortable acknowledging and talking about like [sic] path forward if the court decided to send the boys back home, where the boys would share a bedroom, that was a point of contention for them as far as like how would they work that out . . . ." Her testimony supports a finding that she is of the opinion that it would not be appropriate for Gary to share a bedroom and that the children "will need additional and hypervigilant supervision." However, respondent-father is correct that the other two therapists at the termination hearing did not express an opinion on the appropriateness of the home. Thus, we disregard finding of fact 8(kkkk) to the extent it indicates that all of the therapists that testified at the hearing are of the opinion that Gary should not share a bedroom and that the children will need additional supervision. *See In re N.G.*, 374 N.C. 891, 901 (2020) (disregarding findings of fact not supported by clear, cogent, and convincing evidence).

¶ 29        Respondents both challenge finding of fact 8(llll) but for different reasons. Finding of fact 8(llll) states:

> Given their continued lack of appreciation, acceptance of responsibility, and the pattern of behavior exhibited by the parents of technically – but not meaningfully – engaging in their case plan, these Juveniles are very likely to be neglected in the future if they are returned to the Respondent Parents.

¶ 30        Respondent-father contends that the finding concerning the likelihood of neglect is speculative and inconsistent with the record. Respondent-father challenges the trial court's characterization of his attitude and actions, arguing that the record establishes that he accepted responsibility for the condition of the home, domestic violence, and his lack of supervision of the children. He asserts that his "completion of his case plan and participation in services even after the change in the permanent plan demonstrated his desire and willingness to do whatever was necessary to regain custody of his children." Thus, he contends the trial court's finding of a likelihood of repetition of neglect is mere speculation. We disagree.

¶ 31        Ms. Ellis testified that respondents had not fully acknowledged responsibility for why the children came into DSS's care. Ms. Spicer testified that respondents never acknowledged "any kind of responsibility for the children's" behavior and that "[t]he only event that [respondents] both acknowledged that could have possibly been negative was the missed dental appointment for [Gary]." This testimony supports the

trial court's finding that respondent-father continued to lack an appreciation and acceptance of responsibility.

¶ 32     Additionally, the trial court made the following unchallenged findings of fact:

> [8.]ooo. . . . [W]hen Ms. Spicer attempted to discuss the boys' behaviors with Respondents, especially the disclosures regarding inappropriate sexual behavior, Respondent Father became angry and abruptly left the therapy session yelling [and] creating a scene in Ms. Spicer's office/waiting room. Respondent Mother remained, but Respondent Father returned shortly thereafter to demand that she leave as well. Respondents expressed displeasure with Ms. Spicer, questioned the validity of the therapy and accused Ms. Spicer of telling the Juvenile, [Richard], "to say that" – referring to the disclosures about inappropriate sexual behaviors between the Juveniles.
>
> ppp. Although it is not uncommon for parents of children taken into custody of DSS to feel initial anger and be resistant, the failure by Respondents here to accept responsibility appears heightened and has persisted through the life of the case.
>
> . . . .
>
> vvv. Further, at this termination hearing, over two years since the Juveniles were taken into custody, Respondents' testimony regarding the disclosure by the Juveniles about viewing pornography defies human logic. Respondents have offered conflicting testimony as to the source of the pornography to which the Juveniles were exposed, how it happened and who was to blame.
>
> . . . .
>
> dddd. Respondents completed substantially all of their case plan but, despite their participation, they have shown that

they have not gleaned sufficient insight into why their three children came into DSS custody.

eeee. When Respondent Mother was asked what trauma, if any, she believed the Juveniles experienced, the only event she acknowledged was the death of the Juveniles' grandmother. Respondent Father also failed to voice an acknowledgment of the traumas about which the Juveniles' therapists testified[.]

ffff. At no point during this termination hearing did Respondent Mother or Respondent Father acknowledge that the Juveniles' diagnoses and behaviors were linked to any inappropriate sexual event/behavior, viewing pornography, domestic violence or substance abuse in the home. This failure on Respondents' part is especially concerning when, according to therapist testimony, the Juveniles' sexualized behaviors were considered "extreme."

These findings demonstrate that respondent-father failed to acknowledge responsibility for his actions and how they affected the children and failed to acknowledge the traumas experienced by the children, and that these failures rendered it difficult for respondent-father to understand how the children's past experiences impact their behavior issues. The unchallenged findings also show that respondent-father failed to acknowledge any responsibility throughout the life of the case. The trial court's findings and the record evidence support the court's finding that the children would likely be neglected if returned to respondents' care.

¶ 33    Respondent-mother challenges as unsupported by the evidence the trial court's statement in finding of fact 8(llll) that she "technically – but not meaningfully – engag[ed] in [her] case plan[.]"Respondent-mother "admits that the evidence in the

case shows that [she] did not totally appreciate or accept responsibility for her conduct in this case which resulted in the removal of the children from her home." She argues, however, that her "failure to accept responsibility does not equate to a conclusion that . . . the children would be neglected in the future if they were returned home because of [her] progress with her court ordered case plan."[2] She contends that "[a]lthough [she] has not taken responsibility for her prior conduct, [she] nevertheless has corrected the conditions which led to the children's removal" because she has refrained from using illegal drugs, refrained from domestic violence, participated in dialectical behavioral therapy through Daymark, participated in numerous parenting classes, and engaged in appropriate visits with the children.

¶ 34        However, "[a]s this Court has previously noted, a parent's compliance with his or her case plan does not preclude a finding of neglect." *In re J.J.H.*, 376 N.C. 161, 185 (2020) (citing *In re D.W.P.*, 373 N.C. 327, 339–40 (2020)); *see also In re Y.Y.E.T.*, 205 N.C. App. 120, 131 (2010) (acknowledging that "parents must demonstrate acknowledgement and understanding of why the juvenile entered DSS custody as well as changed behaviors"). Here, the trial court found that respondents "completed substantially all of their case plan but, despite their participation, they have shown that they have not gleaned sufficient insight into why their three children came into

---

[2] Respondent-mother also challenges finding of fact 8.mmmm. However, 8.mmmm pertains more to the ground of N.C.G.S. § 7B-1111(a)(2) and is not necessary to support the ground of neglect. Therefore, we do not address this challenge. *See In re T.N.H.*, 372 at 407.

DSS custody." Respondent-mother does not challenge this finding. Therefore, respondent-mother's argument is without merit. As stated above, the trial court's findings and the record evidence support the trial court's finding that the children would likely be neglected if returned to respondents' care.

¶ 35　　　　Finally, respondents argue the trial court's findings do not support the conclusion that their parental rights were subject to termination based on neglect. Respondents do not challenge the children's prior adjudication of neglect. Rather, they contend that the evidence and findings of fact do not support the trial court's determination that there was a likelihood of future neglect if the children were returned to their care.

¶ 36　　　　Terminating parental rights on the ground of neglect

> requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent. When determining whether such future neglect is likely, the district court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.

*In re R.L.D.*, 375 N.C. at 841 (2020) (cleaned up).

¶ 37　　　　The children were previously adjudicated neglected on 30 May 2018. The trial court's findings establish that the children were diagnosed with post-traumatic stress disorder and suffered from behavioral issues as a result of the trauma experienced while in respondents' care. The findings also establish that respondents failed to

accept responsibility for their actions and for the trauma the children experienced and failed to acknowledge or address the disclosures of inappropriate sexual behavior between the children. Consequently, we conclude the trial court's findings of fact support its conclusion that respondents neglected the children and that there was a high likelihood there would be a repetition of neglect if they were returned to their care. Therefore, the trial court did not err in determining that grounds existed to terminate respondents' parental rights based on neglect under N.C.G.S. § 7B-1111(a)(1). Because the ground of neglect is sufficient to support the trial court's order of termination, we need not address respondents' arguments as to the remaining ground under N.C.G.S. § 7B-1111(a)(2). *In re A.W.*, 377 N.C. 238, 2021-NCSC-44, ¶44

**B. Disposition**

¶ 38        Respondent-mother does not challenge the trial court's dispositional determination that termination of her parental rights was in the children's best interests. Respondent-father challenges the court's conclusion only with regard to his oldest child, Gary. Respondent-father argues the trial court abused its discretion in determining that termination of his parental rights was in Gary's best interests. We disagree.

¶ 39        If the trial court finds a ground to terminate parental rights under N.C.G.S. § 7B-1111(a), it proceeds to the dispositional stage where it must "determine whether

terminating the parent's rights is in the juvenile's best interest" based on the following factors:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019). Although the trial court must consider all six of the enumerated factors, it is required to enter written findings of fact concerning only those factors that are relevant. *In re A.K.O.*, 375 N.C 698, 704 (2020).

We review the trial court's dispositional findings of fact to determine whether they are supported by the evidence received before the trial court. *See In re J.J.B.*, 374 N.C. 787, 793 (2020). Dispositional findings not challenged by respondent are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437 (2019). "The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. 3, 6 (2019). "[A]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary

that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C.

101, 107 (2015) (citing *State v. Hennis*, 323 N.C. 279, 285 (1988)).

¶ 41        In determining termination of respondent-father's parental rights was in

Gary's best interests, the trial court made the following pertinent findings of fact:

> 10. <u>Disposition</u>. . . . All statutory factors were considered
> including, but not limited to those discussed below:
>
> . . . .
>
> b. As to [Gary], despite his diagnosis unrelated to trauma
> – those being Autism and ADHD – [Gary] is highly
> functioning and has made progress in therapy and while in
> foster care. He has learned and exhibited better coping
> skills and a greater awareness of his behaviors ("Why can
> I be good when I don't see my parents?"). [Gary] does have
> a bond with Respondent parents because of his age when
> he came into DSS custody. However, that bond is, in some
> ways, unhealthy. [Gary] is more concerned about his two
> younger brothers and shows a greater desire to visit them
> than he does his parents. [Gary] has viewed himself as the
> caregiver for the two younger children for too long. He has
> memories of his relationship with Respondents which are
> unhealthy. In fact, [Gary] has expressed a desire to be
> adopted and to not return to Respondents' home. His
> current placement is a good placement but not an adoptive
> placement. Adoption, while not an immediate option
> because he is not in an adoptive placement, is a realistic
> possibility for him as he continues to show improvement
> over the next year or two.
>
> c. The best way this Court can give these Juveniles the
> opportunity to lead healthy, successful lives is for the
> Respondents' parental rights to be terminated.
>
> 11. <u>Best Interest/Placement/Visitation</u>. The best interests
> of the Juveniles would be served by terminating the

> parental rights of Respondent Mother and Respondent Father in order to achieve the permanency plan of <u>Adoption</u> for the Juveniles. It is also in the Juveniles' best interests that there be no further contact with Respondents.

¶ 42 Respondent-father first challenges as "speculative and unsupported by the evidence" the trial court's finding that adoption was a "realistic possibility" for Gary. Respondent-father argues the evidence showed that Gary was at risk of losing his current foster placement and that his likelihood of adoption was low. Respondent-father specifically points to incidents occurring one week before the termination hearing where the foster parents called the police multiple times, reported that Gary had tried to assault them, and called mobile crisis due to his behavior.

¶ 43 Licensed clinical social worker associate Nicholas Bailey testified regarding the incidents occurring the week before the termination hearing and stated that Gary had an increase in aggression and "[a] moderate regression" in behavior. However, he also testified that "since then, he has actually been doing quite well over the last three to four days" and that the foster mother informed him the morning of the hearing that Gary "was doing quite well." Social worker Ms. Ellis testified that "there was some concern that [Gary] might not be able to remain in that foster home[.]" However, she also testified that Gary's behavior had improved and that his medications had been addressed.

¶ 44        Ms. Ellis testified that although Gary was not in a position for adoption at the time of the hearing and that it was uncertain when he may be in a position to be adopted because "it depend[ed] on his treatment and his continued progress[,]" she also testified that "he's continuing to progress and has – you know, last year, he . . . stepped down to a therapeutic foster home, and he's begun to stabilize." Ms. Ellis testified that she believed it was possible for him to eventually step down from leveled care and find a long-term or adoptive foster home. This testimony supports the trial court's finding that adoption "is a realistic possibility for [Gary] as he continues to show improvement over the next year or two."

¶ 45        Respondent-father does not challenge the remainder of the trial court's findings of fact, and they are binding on appeal. He argues, however, that the statutory factors do not support the trial court's determination that it was in Gary's best interests to terminate his parental rights because Gary "was nearly ten years old at the time of the hearing, would have remained bonded to his parents but for the trial court's termination of visitation, and had special needs that respondents were prepared to manage."

¶ 46        However, the record and findings of fact demonstrate that the trial court considered the appropriate dispositional factors and "performed a reasoned analysis weighing those factors." *In re Z.A.M.*, 374 N.C. at 101. The court found that Gary was highly functioning despite his diagnoses and was making progress in his treatment

and in foster care; that his bond with respondents was "in some ways, unhealthy[;]" that Gary had expressed a desire to be adopted and to not return to respondents; and that termination would aid in achieving the plan of adoption. Although Gary was not in an adoptive placement at the time, "[t]he absence of an adoptive placement for a juvenile at the time of the termination hearing is not a bar to terminating parental rights." *In re A.J.T.*, 374 N.C. 504, 512 (2020); *see also In re C.B.*, 375 N.C. 556, 561 (2020) ("[T]he trial court need not find a likelihood of adoption in order to terminate parental rights."). We conclude the trial court's determination that terminating respondent-father's parental rights was in Gary's best interests was not so manifestly unsupported by reason as to constitute an abuse of discretion.

## III. Conclusion

In summary, we conclude the trial court did not err in concluding that grounds existed to terminate respondents' parental rights on the ground of neglect and did not abuse its discretion in determining that termination of respondent-father's parental rights was in Gary's best interests. Respondent-mother did not challenge the trial court's best interests determination, and respondent-father did not challenge the trial court's best interests determination regarding Richard and John. Accordingly, we affirm the trial court's order terminating respondents' parental rights to the children.

AFFIRMED.